## School District of Mifflin *versus* Learn.

1. The 3d section of Act of August 25th 1864, relating to bounties, imposes no obligation on a township; it simply transfers the right which a substitute may have to a local bounty to the person whose substitute he is.

2. The law did not make it the duty of a district to pay bounties or contract to pay them. It merely authorized such payments to be made in certain cases, if the officers of the district chose to make them.

3. That public meetings were held to promote filling the quota, committees appointed to obtain recruits and donations and at one of the meetings some of the school directors present reported that a sum of money in the treasury should be used to fill the quota, did not constitute a contract by the district to pay.

4. A resolution of a school board that the "moneys on hand be appropriated to volunteers under the present call, &c., until the money is all expended," was not a contract with anybody.

5. It was intended to operate prospectively alone; a proposition binding on the district when accepted; it was not a promise to pay the bounty to any who had previously entered the service.

ERROR to the District Court of *Allegheny county.*

This was an action of assumpsit, to October Term 1865, by J. P. Learn *v.* The School District of Mifflin township, to recover $300—the amount offered by the school board to volunteers to fill the quota of the township.

The plaintiff was a citizen of the district, and liable to draft

under the call of the President for 300,000 men, and on the 1st of February 1865, he furnished John Shedd as his substitute and had him mustered into the service of the United States for the term of one year; Shedd was credited to the quota of the district and continued in the service until he was regularly mustered out at the close of the war. The plaintiff paid his substitute a bounty of $1150. The board of school directors, on the 13th of August 1864, levied a tax of seventy-five mills on the dollar of the assessed valuation of the property of the township for the purpose of paying a bounty to volunteers to fill the quota of the township under a previous call of the President for 500,000 volunteers—over $40,000 were realized from said tax, and about $16,000 by voluntary contribution; after paying bounties to the volunteers to fill the quota of the township under that call there remained in the hands of the treasurer of said board over $4000, when the last call of the President for 300,000 men was made, and the quota of the district under that call was assigned.

In January and February 1865, public meetings of the citizens were called and held for the purpose of filling the quota of the township under the last call; a committee was appointed to obtain recruits, and to procure voluntary subscriptions for the purpose of paying bounties, not to exceed five or six hundred dollars to each volunteer; at one of the meetings of the citizens a number of the school directors were present, and were called upon by the president of the meeting to make known what they would do, and thereupon they retired and held an informal meeting, and resolved that the balance of the money in their hands should be used to fill the quota, and reported their action to the meeting.

A fund of some thousands of dollars was raised by voluntary contribution, for the purpose of paying bounties to volunteers to fill the quota of the district, under the call. And on the 3d of April 1865, the board of school directors, at a full meeting of the board, unanimously adopted the following resolution, viz.: "Whereas, in March 1864, an act of the legislature was passed authorizing the school board to levy a tax sufficient to pay $300 to each and every volunteer. Whereas, the quota of the township being one hundred men, including previous deficiencies, the school board proceeded to levy said tax. Recruiting committees recruited seventy-nine men, all that was required of the township, leaving a balance on hand.

"Resolved, that all moneys now on hand be appropriated to volunteers under the present call for 300,000 men, at the rate of $300 per man, until the money is all expended, the same to be checked out by O. H. P. Blackburn, to the recruiting committee."

The recruiting committee were not able to procure any volunteers for the amount of bounty authorized to be paid by the town-

[School District of Mifflin *v.* Learn.]

ship, and the quota of the district was not filled when the traitor armies surrendered. The necessity for filling the quota having ceased with their surrender, the committee refunded to the subscribers the money that had been voluntarily contributed by them. No portion of the balance of the fund in the hands of the school directors was used in payment of bounties to volunteers. The fund remaining in their hands is sufficient to satisfy the claims of those liable to draft, who furnished substitutes that were credited to the quota of the district, under the quota of the last call of the President, including the claim of the plaintiff.

The court (Williams, A. J.), after stating the facts, &c., charged:—

"Whether the plaintiff, under all the evidence in the case, is entitled to recover or not, is a question of law which will be reserved for the consideration of the court in banc. For the present the court declines to instruct the jury as requested by defendants' counsel, that taking all the evidence in the case to be true the plaintiff is not entitled to maintain the action and to recover the amount of bounty demanded. On the contrary the court instructs the jury *pro forma* that if the evidence is believed the plaintiff is entitled to maintain the action and to recover the amount demanded; reserving the question, however, for the consideration and judgment of the court in banc. The jury, therefore, if they find for the plaintiff will find subject to the opinion of the court on the question reserved as aforesaid. And if the court shall be of opinion that the law is with the plaintiff on the said reserved question, then judgment to be entered in his favor on the verdict for the amount found by the jury. But if the court shall be of the opinion that the law is with the defendants, then judgment to be entered for the defendants, *non obstante veredicto.*"

There was a verdict for the plaintiff for $310.50, on which the court entered judgment for the plaintiff.

There were several assignments of error as to the ruling of the court on questions of evidence and in the charge, which not being considered in detail in the opinion of the court, are not inserted.

*R. & S. Woods* and *J. R. Large*, for plaintiffs in error.

*C. C. Taylor*, for defendant in error.

The opinion of the court was delivered, November 5th 1866, by STRONG, J.—Of the several assignments of error in this record but one requires particular attention. Our opinion of that takes away all importance from the others. At the trial there were really no disputed facts, and the court instructed the jury to re-

turn a verdict for the plaintiff, reserving the general question whether, under all the evidence in the case, he was entitled to recover.

As the action was founded upon contract, if there was no evidence to show the existence of any such contract as that averred in the declaration, the positive direction given to the jury was erroneous, and there was also error in giving judgment for the plaintiff upon the reserved question. The primal question, therefore, is, what proof was exhibited, if any, that there was a contract between the parties? It appeared that the plaintiff below was a citizen of the school district of Mifflin township in 1864, when the last call of the President was made for 300,000 men to be mustered into the military service of the United States government. He was liable to draft in order to fill the quota of the district under that call.

On the 1st day of February 1865, he furnished as a substitute and had mustered into the service a recruit named John Shedd, who was duly credited to the quota of Mifflin township, and who continued in the service until he was regularly mustered out at the close of the war.

To this substitute the plaintiff paid a bounty of $1150. He thus became entitled to recover from the school district the same bounty which John Shedd would have been entitled to recover, had he, on the 1st day of February 1865, volunteered to enter the service on his own account, and been credited to the township, instead of entering as a substitute for the plaintiff. Such is the effect of the 3d section of the Act of Assembly of August 25th 1864, Pamph. L. 986. But that section imposes no obligation upon the township. It creates no new legal right. It simply transfers the right which a substitute may have to a local bounty, to the person who contracted with him to serve as a substitute, and who paid him a bounty for such service.

If, therefore, John Shedd would have had a legal claim upon the district, had he volunteered, when he did, on his own account, and not as a substitute for the plaintiff, that claim would be transferred by the act to the plaintiff, and there may be a recovery in this action. What right then would John Shedd have had in the supposed case? Manifestly none, unless there was an assumption by the district to pay him. The law did not make it the duty of the district to pay bounties or to contract to pay them. It merely authorized such payments and contracts to be made in certain cases, if the officers of the district chose to make them. There would be therefore in the case supposed, and there is in the present case, no implied promise to pay a bounty growing out of a mere legal obligation. Nor is there any express contract to be found in the facts, that public meetings were held in the township to promote filling the quota by volunteers, that com-

mittees were appointed to obtain recruits and obtain donations to pay bounties, and that at one of these meetings some of the school directors were present, three in number, who, after consultation, reported to the meeting that a sum of money in the treasury should be used to fill the quota. Whether these meetings were held, and whether this report was made before the 1st of January 1865, does not appear. Whether they were or not, the school district could not and did not contract in that way with any one. All that remains which is thought to show any contract between the parties, all that is relied upon by the plaintiff, is the resolution adopted by the school board, on the 3d of April 1865. It appears that there was in the treasury, at that time, the sum of about $4000, remaining after the payment of bounties to volunteers under a former call. On the 3d day of April, the school directors adopted the following resolution : " Resolved, That all moneys now on hand be appropriated to volunteers, under the present call for 300,000 men, at the rate of $300 per man, until the money is all expended, the same to be checked out by O. H. P. Blackburn to the recruiting committee." This resolution in itself amounts to no contract with anybody. The motive that induced its passage, the object sought to be secured by it, plainly was the encouragement of volunteering, until the quota of the district under the new call should be filled, and thus a draft become unnecessary. It must, therefore, have been intended to operate prospectively alone. It was at most a proposition to those who, after its passage, might contemplate entering the service, encouraging them to do so, and binding on the district when accepted. It said to all able-bodied men : " If you will voluntarily enter the military service of the United States, and be credited to this district on the last call, we will pay each of you $300, until the money in the treasury shall be exhausted." Volunteering after the passage of the resolution may have been on the faith of it, volunteering before its passage could not have been. If the resolution amounts to a promise to pay those who had volunteered before its passage, as well as those who might enter the service thereafter, and be credited to the quota of the district, its effect, as a stimulus to voluntary enlistment, would have been greatly diminished, and it might have amounted to nothing. Had thirteen persons volunteered before April 3d 1865, no part of the fund in the treasury would have remained to invite volunteering after that day. Thus, the appropriation of the money would have done nothing toward relieving the district from the impending draft. Such a construction of the resolution is unreasonable. It shuts out of view the end sought to be obtained by it, and converts it into a mere donation in return for a past benefit. When the plaintiff put a substitute into the service, it was not an act done as a consideration for

[School District of Mifflin *v.* Learn.]

any undertaking of the district, nor was it an acceptance of any offer the district had made.

It is undoubtedly true that a volunteer, who entered the service on the 1st of February 1865, and was duly credited to the district, contributed as much to relieve the district from the draft as did any one who entered the service after that date. In justice he may have been equally deserving of a bounty. But the question now is, was there any contract to pay such a volunteer any bounty? We are determining legal rights, not what may be equality of deservedness. And we are unable to discover that there was any legal liability of the school district to the plaintiff, arising either by implication of law or out of any contract. The instruction given to the jury, heretofore stated, and the judgment upon the reserved question, were therefore erroneous.

> The judgment is reversed, and judgment is now given upon the reserved question for the defendants, *non obstante veredicto.*